UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INSTALLATION, MONITORING MAINTENANCE, REPAIR, AND REMOVAL OF A GLOBAL POSITIONING SYSTEM MOBILE TRACKING DEVICE ON A 2000 TOYOTA CAMRY VEHICLE IDENTIFICATION NUMBER JT2BG22KXY0516367 AND MASSACHUSETTS REGISTRATION 8FV431 | **FILED UNDER SEAL**<br><br>Case No. 17-mj-4257-DHH |

### AFFIDAVIT OF TASK FORCE OFFICER GREGG DEBOER

I, Gregg DeBoer, being duly sworn, depose and state as follows:

### AGENT BACKGROUND

1. I am a detective with the Hopkinton Police Department, where I have been employed since 1999. Prior to that, I was employed by the Westborough and Charlton Police Departments for a total of five years. I am currently assigned as a Task Force Officer ("TFO") with the Drug Enforcement Administration's ("DEA") Worcester High Intensity Drug Trafficking Area ("HIDTA") Group.

2. As a DEA TFO I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I hold a bachelor's degree in Criminal Justice from Western New England College. I completed basic law enforcement training at the first Municipal Police Officer Class recruit training, Boylston Academy. While at the academy, I received over 200 hours of training in criminal laws and investigations. Since graduating from the police academy, I have received

1

hundreds of additional hours of advanced training from the Massachusetts Criminal Justice Training Council, the Massachusetts State Police, the Middlesex District Attorney's Office, the Federal Bureau of Investigation ("FBI"), and the DEA in law enforcement and criminal investigation. This has included over 100 hours of street level narcotics investigators training. On numerous occasions, I have acted in the capacity of an undercover police officer where I have been directly involved in the sale and purchase of narcotics.

4. During my career as a law enforcement officer, I have assisted the Hopkinton Police Department, other municipal departments, and the DEA in multiple state and federal drug investigations which have led to the execution of search warrants, the arrest and conviction of individuals involved in drug trafficking, the seizure of money, and the recovery of controlled substances including marijuana, heroin, crack cocaine, powder cocaine, and prescription narcotics.

5. In the course of my official duties as a law enforcement officer and TFO, I have interrogated many defendants, informants, and suspects who were distributors and/or users of controlled substances. From my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors. I am also familiar with the full panoply of methods, practices and techniques by which members of organized conspiracies illicitly package, conceal, transport and distribute controlled substances.

6. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, and to protect their operations, members, narcotics, and narcotics proceeds.

7. I am also familiar with the appearance and costs of controlled substances, including the controlled substance, heroin, which is the principal subject of this Affidavit.

8. I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and other means to transport and distribute narcotics and the proceeds of narcotics trafficking. From my training and experience, I am aware that drug traffickers often transport drugs and drug proceeds in motor vehicles, and that drug traffickers often use motor vehicles to meet with coconspirators, including their sources of supply and/or their drug customers. Drug traffickers also use motor vehicles to travel to banks and other financial institutions to deposit drug proceeds and/or transfer funds to purchase drugs. Experienced drug traffickers will often engage in counter-surveillance maneuvers while driving a vehicle in an attempt both to determine whether they are being followed by law enforcement and to disrupt any surveillance activities being conducted by law enforcement. I am also aware, from my training and experience, that drug traffickers often install and use electronically operated hidden compartments in motor vehicles to transport large quantities of drugs and drug proceeds.

9. Based on my training and experience, narcotics trafficking typically involves local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers. Within the United States and the District of Massachusetts, illegal drugs and drug money are most often transported in motor vehicles. Consequently, the location of vehicles used by narcotics traffickers and those working with them can be instrumental in identifying and intercepting shipments of illegal drugs and drug proceeds.

10. More broadly, based upon my training and experience, tracking drug traffickers in motor vehicles frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) identification of potential criminal associates, such as criminal

co-conspirators, suppliers of illegal narcotics, and money launderers; (b) identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions, and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

11. Based on my training and experience, tracking narcotics traffickers in motor vehicles often corroborates and verifies other information and investigative leads derived from other investigative techniques including informants, wiretaps, and visual surveillance.

## PURPOSE OF AFFIDAVIT

12. I submit this affidavit in support of an application for an Order, pursuant to Rule 41(e)(2)(C) and Title 18, United States Code, Section 3117, authorizing DEA agents to surreptitiously install, monitor, repair, replace, and maintain a real-time Global Positioning System ("GPS") mobile-tracking device for a period of forty-five (45) days on the following motor vehicle, located in the District of Massachusetts, in order to monitor and record data regarding the movements of the vehicles, during daytime and nighttime hours, both inside and outside the District of Massachusetts:

> A 2000 Toyota Camry Vehicle Identification Number JT2BG22KXY0516367, and MA Registration 8FV431, registered to JOSE ORTIZ, 161 West Mountain Street, Apt B8, Worcester, Massachusetts (the "Subject Vehicle").

13. I am seeking the warrant in furtherance of an ongoing criminal investigation into the activities of: (1) ROBERTO ORTIZ, (2) JOSE ORTIZ, (3) JORGE BURGOS, (4) MARIA COTO, (5) JOSE RIVERA, (6) BRIAN STOLIKER, (7) LUIS PACHECO, (8) JOSEPH NERI, and other persons as yet unknown, for offenses that include the distribution of controlled

substances, in violation of 21 U.S.C. § 841, and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846 (the "Target Offenses").

14. As described below, there is probable cause to believe that: JOSE ORTIZ and ROBERTO ORTIZ, have committed, are committing, and will continue to commit the Target Offenses; (b) the Subject Vehicle is being and will be used to commit and to facilitate the commission of the Target Offenses; and (c) the data obtained from the GPS devices about the geographic location of the Subject Vehicle will constitute and/or will lead to evidence, fruits, and instrumentalities of the Target Offenses, as well as to the identification of the individuals who are committing those and related crimes.

15. I have personally participated in this investigation since August of 2016. The information below comes from my involvement in the investigation, interviews with – and analysis of reports submitted by – other investigators participating in this investigation, surveillance, and interviews of confidential sources.

16. Because this affidavit is submitted for the limited purpose of securing an Order authorizing the government to install, monitor, repair, replace, and maintain real-time GPS mobile-tracking devices on the Subject Vehicle, I have not included details of every aspect of the investigation, nor have I set forth each and every fact I have learned during the course of this investigation. Instead, I have included only those facts and circumstances that I believe are necessary to establish probable cause for the issuance of such an Order.

## BASIS FOR PROBABLE CAUSE

17. As part of an investigation of a larger Drug Trafficking Organization ("DTO"), two DEA cooperating sources have made controlled purchases of heroin and/or heroin mixed with fentanyl[1] from JOSE ORTIZ and ROBERTO ORTIZ.

18. Cooperating Source #1 ("CS-1")[2] has engaged in 11 controlled purchases of narcotics from JOSE and ROBERTO ORTIZ between August 2016 and May 2017: (1) October 7, 2016; (2) October 13, 2016; (3) October 21, 2016; (4) October 28, 2016; (5) November 14, 2016; (6) December 9, 2016; (7) January 6, 2017; (8) January 23, 2017; (9) February 16, 2017; (10) March 21, 2017; and (11) May 21, 2017.

19. A second cooperating source, ("CS-2"), accompanied CS-1 for the transactions occurring on: (1) October 7, 2016; (2) October 13, 2016; (3) October 21, 2016; and (4) October 28, 2016.

---

[1] As confirmed by laboratory analysis and/or field testing.

[2] During the course of the investigation agents have recently discovered reason to believe that on more than one occasion, CS-1 obtained, unlawfully, bags of heroin during controlled purchases for CS-1's personal use by purchasing more heroin than was turned over to DEA after the controlled purchases. For example, text messages obtained from the phone of CS-1 reveal that CS-1 purchased eleven bags of heroin, yet turned over only ten to DEA after a purchase. CS-1 is believed to have been deceptive with agents concerning these actions. And, CS-1 is believed to have deleted text communications that took place with one or more of the subjects of investigation, including JOSE and/or ROBERTO ORTIZ during the course of controlled purchases, in order to hide CS-1's illegal conduct. CS-1 was recently confronted and admitted that on at least one occasion, CS-1 purchased more heroin than was turned over to DEA.
   Further, as CS-1 and CS-2 are in a relationship, I suspect that CS-2 was aware of, if not complicit in CS-1's misconduct. Nevertheless, as detailed herein, I believe that the corroborated and independently obtained information described herein is sufficient to establish the necessary probable cause and that this Court need not rely on information provided solely by CS-1 or CS-2 in issuing the requested tracking warrant.

20. On November 7, 2016, a tracking warrant[3] was issued by this Court for a blue Jeep Grand Cherokee, MA 38KV30, that had been driven to controlled purchases occurring on October 7, 2016, October 13, 2016, October 21, 2016, December 9, 2016, January 6, 2017, and January 23, 2017.

**February 16, 2017 Controlled Purchase from JOSE and ROBERTO ORTIZ**

21. On February 16, 2017, CS-1 exchanged a series of text messages and one or more unrecorded phone calls with the user of the telephone phone assigned number (413) 717-7806 (hereinafter the "JOSE ORTIZ phone")[4] to arrange for the purchase of heroin. At approximately 8:35am CS-1 texted, "can i come see you sround 11am?" At 8:36am, the user of the JOSE ORTIZ phone responded, "yes." (I believe that CS-1 has asked if CS-1 can purchase heroin and the user of the JOSE ORTIZ phone has agreed).

22. At 12:54pm CS-1 texted the JOSE ORTIZ phone, "just at the atm then be there," and at 12:56pm the user of the JOSE ORTIZ phone responded, "ok same place."[5]

---

[3] That warrant was renewed on December 22, 2016 and March 6, 2017.

[4] On November 14, 2016, December 9, 2016, January 6, 2017, and January 23, 2017, CS-1 had contacted that telephone and had made purchases of substances that field-tested positively for heroin and/or fentanyl from JOSE and ROBERTO ORTIZ. For example, on January 23, 2017, CS-1 made arrangements to purchase heroin from the user of the JOSE ORTIZ phone. On that date, under the supervision of agents, CS-1 purchased ten bags of a substance that was found by the DEA laboratory to contain heroin and fentanyl from JOSE and ROBERTO ORTIZ. That sale took place in the parking lot of 161 West Mountain Street in Worcester. Agents have reviewed the recording of that controlled purchase made by a recorder placed in CS-1's vehicle. JOSE ORTIZ is captured on the video from that sale and can be identified from the recording.

[5] *See supra*, note 4 (noting the prior transaction had occurred in the parking lot of 161 West Mountain.)

23. At approximately 1:20pm, agents met with met with CS-1 at a pre-arranged meeting location.[6] CS-1 and CS-1's vehicle were searched, and, CS-1 was provided with a recording device and purchase money. At approximately 1:25pm, in the presence of agents, CS-1 received an unrecorded phone call from the JOSE ORTIZ phone directing CS-1 to meet at the upper parking lot at 161 West Mountain Street[7] and indicating that the caller was concerned about police surveillance. The caller further informed the CS that the caller would be watching to make sure that CS-1 was not followed. CS-1 was followed by agents from the meeting location to 161 West Mountain Street, however, at 161 West Mountain, CS-1 was not followed into the parking lot and CS-1's arrival was instead observed by agents previously stationed at that location.

24. At 1:18pm, agents previously stationed to conduct surveillance at 161 West Mountain Street, observed the Subject Vehicle[8] arrive at the upper parking lot. Agents observed CS-1 arrive and park in the upper lot at approximately 1:36pm. Agents then observed JOSE ORTIZ approach the driver's side door of the CS vehicle. During this same time, a female, later identified as the daughter of JOSE ORTIZ, was observed walking up and down the sidewalk

---

[6] Tolls for the JOSE ORTIZ phone reflect an outgoing call to CS-1 at approximately 1:19pm lasting approximately one and a half minutes.

[7] JOSE ORTIZ has listed 161 West Mountain Street, 8B, Worcester, Massachusetts as his address on his driver's license. The RMV has the same address for ROBERTO ORTIZ.

[8] On January 10, 2017, agents conducting surveillance at 161 West Mountain Street observed JOSE ORTIZ enter the Subject Vehicle which, at that time, had the license plate number MA 4HL768. JOSE ORTIZ waited in the vehicle and was soon joined by ROBERTO ORTIZ. The two then drove away in the Subject Vehicle. Similarly, on February 6, 2017, agents at 161 West Mountain observed ROBERTO and JOSE ORTIZ exit the Subject Vehicle, which as of that date had the license plate, MA 8FV431. Agents discovered that the Subject Vehicle, previously registered to another individual, had been registered as of February 3, 2017 in the name of JOSE ORTIZ, with an address of "161 West Mountain Street B8, Worcester, Massachusetts" under the plate MA 8FV431.

looking at the parked cars and at the arriving cars. Agents believe that this female was engaged in counter surveillance and was attempting to locate any potential police surveillance.

25. At approximately 1:36pm, CS-1's vehicle was observed leaving the area of 161 West Mountain Street and was followed to a pre-arranged meeting location. At that location, CS-1 and CS-1's vehicle were searched, the recording device was retrieved, and CS-1 turned over ten bags containing suspected heroin.

26. CS-1 reported that when CS-1 arrived, CS-1 had observed the Hispanic male who had previously sold CS-1 heroin (JOSE ORTIZ), "Papi," (known by agents to be ROBERTO ORTIZ), and a female standing in the area of the Subject Vehicle. JOSE ORTIZ then walked to the driver's side of the CS vehicle, and provided CS-1 with the suspected heroin in exchange for $400.

27. JOSE ORTIZ is captured on the video recording of the controlled purchase and is identifiable from the video.

28. The purchased substance field tested positively for Fentanyl, and was sent to the DEA Laboratory for testing. That analysis is not yet complete.

**September 13, 2017 Surveillance of JOSE and ROBERTO ORTIZ in the Subject Vehicle**

29. On September 13, 2017, agents conducted surveillance of ROBERTO and JOSE ORTIZ. Over the course of that day, agents observed JOSE and ROBERTO ORTIZ travelling around Worcester in the Subject Vehicle.

30. In particular, at approximately 3:47pm, agents observed JOSE and ROBERTO ORTIZ leave the property at 161 West Mountain Street and travel to the area of 266 Lincoln Street in Worcester.

31. At approximately 4:14pm, agents observed a 2004 Jeep Grand Cherokee (MA 462AP1), registered to Aimee Perkins, 182 Southbridge Road, Dudley, Massachusetts, arrive at

the location. The Jeep was being operated by a male, known to agents to be Brian Stoliker. Stoliker was observed to approach the ORTIZ brothers and one of the agents then observed Stoliker hand JOSE ORTIZ an unknown amount of US currency. JOSE and ROBERTO ORTIZ and Stoliker then returned to their vehicles.

32. Surveillance of both the Jeep and the Subject Vehicle continued that afternoon. At approximately 5:36pm, both vehicles met at the Cumberland Farms, located at 263 Grafton Street in Worcester. There, agents observed JOSE ORTIZ provide Brian Stoliker with an item, the packaging of which was consistent with the packaging of heroin. JOSE ORTIZ then returned to the Subject Vehicle and left the area.

33. The Jeep was followed to the area of the Compass Tavern at 90 Harding Street. There, agents observed the occupants of the vehicle going through the steps needed to inject heroin *i.e.*, mixing a syringe, and appearing to inject a substance.

## AUTHORIZATION REQUEST

34. WHEREFORE, I request that this Court issue warrants authorizing members of the DEA or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to:

(a) install a GPS tracking device in or on the Subject Vehicle within ten (10) calendar days of the issuance of the warrant;

(b) repair, replace, maintain, and remove said GPS tracking device from the Subject Vehicle after use of the tracking device has ended;

(c) move the Subject Vehicle to effect the installation, repair, replacement, and removal of the GPS tracking devices; and

(d) monitor the tracking device, during both daytime and nighttime hours, for a period of 45 days following the issuance of the warrant.

35. In addition, I request that the Court authorize installation, replacement, maintenance, and removal of the tracking device during both daytime and nighttime hours in order to ensure the safety of the executing agent(s) and to avoid premature disclosure of the investigation.

36. In the event that the Court grants this application, agents will conduct periodic monitoring of the tracking device during both daytime and nighttime hours for a period of up to 45 days from the date of the warrant's issuance. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

37. Because the warrant and accompanying affidavit and application in support thereof reveal an ongoing investigation, it is further requested that the warrant and accompanying affidavit and application be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others, except that a copy of the warrants in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents, Task Force Officers, and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative law enforcement officers, as necessary to effectuate the warrant.

38. Because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation as previously described, I also request that the warrant delay notification of the execution of the warrant for a period not to exceed 30 days after

the end of the authorized period of tracking (including any extensions thereof), in accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3).

39. Based upon the information in this Affidavit and observations by law enforcement officers of the Subject Vehicle during surveillance, I believe that the Subject Vehicle is presently within the District of Massachusetts.

40. It may be necessary to enter onto private property in order to effect the installation, repair, replacement, maintenance, and removal of the tracking device. The Subject Vehicle has been observed parked at 161 West Mountain Street, Worcester, Massachusetts 01606 and on other private property.  161 West Mountain Street is an apartment complex to which the public has a right of access. It consists of 2 large multi-unit apartment buildings and 6 large parking lots of associated parking.

41. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, the United States requests the Court authorize any installation, replacement, maintenance and removal of the tracking device during both daytime and nighttime hours. Nighttime searches in narcotics investigations are specifically addressed by statute.  In this regard, Title 21 U.S.C. § 879 provides:

> A search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge or United States magistrate judge issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time.

42. In addition, authority to install or replace the tracking device outside of daytime hours is sought because installation outside of daytime hours will, among other things, minimize the risk of detection.  To explain, it is this agent's experience that most individuals involved in the illegal distribution of controlled substances undertake efforts to detect whether their conduct is being observed by law enforcement.  Here, the tracking device may be installed or replaced in the

driveway or parking lot abutting what is suspected to be the residence of a target of the investigation (or at least locations where targets may spend significant time). It is unlikely that agents will know if the target of the investigation, or some other individual who will report seeing agents to the target, will be present within the residence in a location overlooking the parking lot or driveway. Similarly, it is unlikely if agents will know whether a neighbor of the target will be in a position to observe the installation or repair and it is likely that a neighbor who observed agents surreptitiously installing or repairing a tracking device may disclose it to the target.

43. In the event that the Court grants this application there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period of up to 45 days from the date of the warrant's issuance. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

## CONCLUSION

44. WHEREFORE, I submit that there is probable cause to believe that: (a) JOSE and ROBERTO ORTIZ have committed, are committing, and will continue to commit the Target Offenses; (b) the Subject Vehicle is being used to facilitate the ongoing narcotics trafficking activities of a criminal organization in the District of Massachusetts; and (c) the data obtained from the GPS device about the geographic locations of the Subject Vehicle will constitute and/or will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

45. As a result, I respectfully request that the Court issue a warrant authorizing members of DEA or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install, repair, replace, and maintain a real-time GPS mobile-tracking device on the Subject Vehicle

within the District of Massachusetts, during both daytime and nighttime hours, and to remove said tracking device from the Subject Vehicle after the authority to use the tracking device has ended; to move the Subject Vehicle to effect the installation, repair, replacement, maintenance, and removal of the tracking device; and to monitor the tracking device, during both daytime and nighttime hours, for a period of 45 days following the issuance of the warrant, including when the tracking device is inside a private garage and other locations not open to the public or visual surveillance, both within and outside the District of Massachusetts.

_____
GREGG DEBOER
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION


Sworn to before me this __4__th day of October, 2017

_____
DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

-